All right, Mr. Gouroff, we're happy to hear from you. Good morning, Your Honors. David Gouroff along with Erica Morabito and Brittany Nelson on behalf of NHF and may it please the Court. Your Honors, in deciding the first appeal in this case in 2011, this Court wanted to know what record facts make this case unique and show that the releases in favor of NHF's officers and directors are essential. Here the record, and in particular the transcript of the confirmation hearing, supplemental facts found by Judge Kenney in his remand order, and findings made in the original confirmation order show that the releases are valid, just as in H. Robbins. I will focus on facts that make the releases both essential to reorganization, the key Dow Corning factor, as well as fair to donors. As to the facts going to essential. What relevance does the first bankruptcy court opinion have here? What relevance is it? It decided what the bankruptcy court needed to do on remand, which is it allowed the bankruptcy court, if the record permitted it. The first bankruptcy court opinion. Oh, I'm sorry, the first bankruptcy court opinion was vacated, but the findings of the court still incorporate the confirmation hearing, and that becomes the record that is before the second bankruptcy court, which looked at the cold record that Judge Mitchell had assembled. So that is still relevant to this court in deciding whether the record allowed Judge Kenney to uphold the releases, and it did, Your Honor. So when I talk about the record, there's the confirmation hearing where there was testimony, for example, from Ms. Ridgely. There was a judicial notice of all prior pleadings and events in the bankruptcy, and that is all part of the record that this court has to look at in determining if Judge Kenney determined things properly. You agree that the second bankruptcy court's opinion is the one that's on appeal and relevant here, that the findings that were made there are the findings that we reviewed? I agree that those findings inform the court's opinion, but the record is still beyond just what Judge Kenney listed out. But we're reviewing the findings of the bankruptcy court judge in the second bankruptcy court opinion. That's correct, Your Honor. Okay. And if you look at those findings, Your Honor. With respect to that, your briefs seem to imply that Judge Kenney would have no choice but to affirm that earlier ruling. I don't think that was the intent of the remand. Is that still your position? The position, Your Honor, is if you look at the record facts, the record facts support the releases. Well, that's a different thing, that the judge had no discretion but to find otherwise. Your Honor, I don't believe that statement that the judge had no discretion but to affirm here. Obviously, when the court remanded, it did so to allow the bankruptcy court, if the record permits it, to set forth specific factual findings. So that was the charge to Judge Kenney, and our argument is that he erred in that. He certainly had the record not permitted it. He not only had the discretion, he had the obligation to decide otherwise. But here the record facts, and many are set forth in Judge Kenney's remand order, supports the releases. Most importantly and essential, NHF has an absolute duty to advance defense costs any time an officer or director is sued. This is without security or assurance of repayment or regard to the merits. Judge Kenney specifically recognized that this duty created an identity of interest that was just the kind of unusual circumstances recognized by this court to support releases in Robbins. He even quoted from Robbins a joint appendix 1555. He said, this unusual situation, it would seem, arises when there is such identity between the debtor and a third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result in the case. Am I correct that the district court judge disagreed with that analysis on that particular factor? He found that the indemnity was no different than a garden variety indemnity, but that was wrong on several counts, Your Honor. Indemnities are not always 100% indemnities. That's what made it unusual in H. Robbins. And so in so finding, he was out of step with this court's guiding precedent. Number two, most debtors do not fail because of a particular kind of lawsuit. Here, and Judge Kenney finds this in the remand order as well, NHF failed because of a single donor lawsuit, the Mancia suit, where there was a $6 million judgment that couldn't be bonded over. One lawsuit. How realistic is it that there are going to be multiple donor suits against the debtor here or against either the debtor or the debtors in solving against the directors? I mean, the only one you're pointing to, I guess, is this one in California. But, Your Honor, the one in California is illustrative. First of all, it does not take many. How many donors are there? There are 9,000, Your Honor. There are how many? 9,000. But some of those, I suppose, have contributed maybe $1,500 or whatever. The vast majority, perhaps, would not be wanting to go to court over it. Your Honor, we know from Judge Kenney's findings, again, this is in his opinion, there were 343 claims filed, so just a small subset of donors actually filed claims, totaling $51 million. So it would not take many suits before NHF, which is modestly sized, would fail again. And, Your Honor, alluded to the California suit, which this Court can take judicial notice of under the Colonial Pen case. That case alleges RICO. It seeks treble damages. And the Behrmans are on a spree to gather assignments from other donors. If they are allowed to sue, others will as well. Excuse me. Didn't the bankruptcy court come down hard on the Behrmans for bringing it? It came down hard on the Behrmans for bringing it against NHF. And, indeed, it sanctioned them because they violated the exculpation provision, which this Court has upheld. But that case remains live as to the directors and officers if this Court strikes down the releases. And there will invariably be copycat cases. And that case is in California for RICO and other claims. These donors are all over the country. Again, it would not take many suits before this 10-employee firm. Is it correct that the Behrmans are the only ones who have actually filed a suit? They are the only ones who actually filed a suit, but everyone else was stayed, Your Honor. And the Behrmans did so jumping the gun. Has anybody asked for relief from the state? They have not, Your Honor. One of the things that concerned me here is that the release was very broad in its terms, that even, for example, if there were the grossest amount of fraud and duplicity and double-dealing on the part of the officers and directors, they would still be able, under the terms of the release, not to be held accountable for the most serious sort of malfeasance. Is it fair to take the exceptional breadth of the release's language as one factor among others? The factors go in different ways here. But is that one factor that weighs against you? Your Honor, I think these releases were significantly narrowed. So they apply to actions by the directors and officers in the operation of NHF through the effective date of the plan. So that's considerably narrowed. Your Honor has already found in NHF-1, so this is a binding determination, that this plan was proposed in good faith. That the directors and officers through the administration... It may have been, but what about the use of the donor's funds? To the extent that there is misuse of the donor's funds, the Biermans and other donors do not have standing, as Judge Brinkma just emphasized in her decision last week. They make a completed gift, losing all right, title, and interest under 26 U.S.C. 4699-D2, once they contribute to a donor advice fund. So they no longer should have a claim against the directors and officers. And the directors and officers are not alleged, if you look at the California action, and the release only covers things they did on behalf of NHF. So we don't have to worry, for example, if the directors and officers embezzled, if they lined their own pockets, that isn't subject to the release. If they had run someone over, that was an example that Mr. Merrick gave in the last argument to this Court, that would not be bound. So what is bound is the same claims that could be brought against NHF. And the reason the release is so important is to that, is because the nature of this indemnity and advancement of fees provision is that every dollar spent defending the directors and officers is a dollar that comes out of NHF's pocket for its charitable mission. So it cannot serve that. And so every expense is borne literally by NHF. That is why Judge Kenney, correctly, and Judge Trenga erred in finding, as to the identity of interest factor. And that same fact goes to essential to reorganization. Is it that they're seeking personal liability, they're seeking to hold the directors and officers personally liable? They are seeking personal liability, but they are doing so based on actions they took on behalf of NHF. If you look at the facts, they... And, of course, it's a basic rule of corporate law that you're, that an officer director is not personally liable for some judgment against the corporation. That, you know, that's basic. But where is the... What's the appropriate place to assert that personal... the personal immunity that officers and directors have vis-a-vis judgments against the corporation? Is the bankruptcy proceeding the best place to assert that personal immunity, or is the immunity against personal liability, or is a later suit, a later donor suit, the best place to assert that kind of personal liability? Because I do take your point, you know, that we don't want officers and directors held personally liable for judgments against the company. That would just cause a lot of people not to want to get anywhere near serving. But where is that argument best advanced, in the bankruptcy proceeding or in a later donor suit? With regard to this debtor, it's certainly in the bankruptcy proceeding, because, Your Honor, those people who felt that they had inducement or rescission claims, and the Biermans were ones, as the record shows, who raised claims for rescission, claiming that they were misled into actually contributing to the donor advised funds, those were claims that could have been brought, and in fact were by other donors brought in the bankruptcy court itself. And those people, like the Biermans, who brought such claims, were held... a personal immunity, not through a release in a bankruptcy plan, but in a later civil suit. You know, let's say a corporation is liable for a judgment because of train wreck or car wreck or products liability suit or whatever. Wouldn't the usual place for the officers and directors to claim immunity from personal liability be in a later civil action? Your Honor, the problem with the later civil action, which is why this release is so important, is because of the duty to advance costs. NHF is spending dollar for dollar each time. And Judge Trenga, in his stay order, and remember there's an extraordinary grant of a stay pending appeal by the district court, who in doing so, and this is the docket number 47 in the district court at page 48, he explained that he has a new appreciation of the tangible harms NHF itself faces because of threats to directors and officers through this suit. And he noted that in the Bierman suit, which is just at the preliminary stages because of the nature of the contempt hearing, more than, at that time, $750,000 had been spent on fees in that one suit at a preliminary stage. And again, this is a debtor... They've been ordered to pay attorney's fees. They have been ordered to pay attorney's fees. I believe it was $325,000 that they've been ordered to pay. But there's a bond on that. Matters continue. And so that money isn't in NHF's hands. NHF is still operating with the Biermans, who were so avid to pursue an improper claim that they jumped the gun. They didn't file the exculpation provision. And that's just a preview of what, if there's blood in the water, if the Biermans can succeed. There is no reason. These are sophisticated donors, Your Honor. They are all across the country. And if you look at the Joint Appendix 1, the first notice to the donors. What was the Texas judgment that drove the company into bankruptcy all about? It was about... Why was the ruling there? Was it a fraud? It was a fraud, Your Honor. The judge, Abel Lemus, pled guilty to racketeering in connection with that lawsuit. He took a bribe. I'm not talking about the judge. I'm talking about the actual judgment. But the judgment was informed by the fraud of the court and the guardian ad litem. But it was about a misuse of funds. It was about a split life insurance policy that they had been duped into contributing, I believe. Was this a malfeasance on the part of the officers and directors? Not on the part of the officers and directors. That was at NHF itself, I believe. So there's not an independent judgment in the Mancia suit against officers and directors. But that is illustrative of a single donor claim with that kind of liability that the court allowed to be entered. If we were to agree with you on this point, would we be close to authorizing putting a stamp of approval on all of these releases as a matter of course? You could expect them to appear in bankruptcy plans everywhere across the circuit. Or is there some limiting principle to your position that would permit us, for example, to approve this release but find that others were impermissible? I mean, one of the concerns I had here was the very breadth of the language and the question I had about whether there's real fraud and malfeasance on the part of people involved with the company. So what's the limiting principle here? Your Honor, there's two. This court commended the consideration of the Dow Corning case. Dow Corning, when it talks about unusual circumstances in the text of that opinion, says is there a mechanism by which those with allowed claims can be paid in full?  Here we had not only a 100-set plan, but a plan that paid 4% above market interest as well. And the second limiting principle is that I began to quote from the beginning from H. Robin, which says where you have an indemnity that amounts to making the debtor stand in the shoes of the directors and officers when sued. So you have both of those here. And those very specific, very, very rare, if you look at the literature of even when non-debtor releases have been granted, very, very few are 100-set plans. But we did ask the bankruptcy court to look closely at the Dow Corning facts that we've spent all our time here on very valid questions and answers on the first factor. Right. And under Dow Corning, there are at least five others. Correct. And we've lost on all of those, both the bankrupt court and the district court. It's a balancing test. So if you could briefly tell us why on that basis those courts were wrong either in any individual factor or the balancing. And, Your Honor, I think we've touched on two, identity and essential. But three of the factors, the did they have a right to vote, does the plan provide a mechanism to pay allowed claims in full, and is there a mechanism for those who choose not to settle to recover, those all turn on whether you have a claim. And that, in turn, turns on whether you are a creditor. If you look at Joint Appendix 1560-61, which is the remand order, Judge Kenney cites the right law. He cites the Lower Bucks Hospital case, which says there's a two-part test. Is there, are creditors who are adversely affected by the release creditors? And are they creditors with claims? And here, the Beermans fail both prongs, and the donors otherwise fail the creditor prong. The Beermans fail the adverse prong because of two reasons. One, they had a mechanism to allow them to recover in full. When the plan was confirmed, they were in the pending donor claim class, which was part of the class of general unsecured creditors 3C that was to be paid in full in the plan. They had the opportunity to litigate their claim and, if successful, be paid 100 cents on the dollar and 4% interest. They chose to settle and withdraw that claim, and by doing that, the claim was mooted. Now they want to raise the same claim again. So they are not adversely affected. Creditors, though, the donors who filed claims and were disallowed, and we know Judge Mitchell disallowed donor claims for misuse of funds because they were completed gifts, as Judge Brinkema has also found. Those who never timely filed or sat on their rights, and this Court has had before the Anderson case, they are not creditors. Thank you, sir. Thank you very much. Mr. Merrick, we'd be happy to hear from you. May it please the Court, my name is Glenn Merrick. With me at council table is Mr. Daniel Shingelis. We represent the appellees of the Behrmans. This case, as the Court is aware, is before it a second time on remand with respect to the third-party releases gained in the NHF reorganization plan. These are extraordinary provisions which every circuit in the land has said are extraordinary provisions to be upheld only in the most unusual of circumstances. This Court, on the first time around, Judge Diaz writing, wrote that we're sending this back to the bankruptcy court to determine whether or not the evidentiary record established at the confirmation hearing would support the specific findings of fact necessary to justify third-party releases in a reorganization plan. That was the question. It went back to Judge Kenney, and on March 12, 2000, I'm sorry, March 6, 2012, Judge Kenney held a status conference at which he offered National Heritage Foundation the opportunity to reopen the record, to supplement the evidence, and to put in anything additional that National Heritage wanted. National Heritage refused. It said no, we don't want that. In fact, Judge Kenney, we think you are bound by the evidentiary record established on October 15, 2009, which was the confirmation hearing. You must make your decision based on the evidence. One of the things that concerns me here is the indemnity provision in the plan, or I guess it's in the plan, but the indemnity provision. And the indemnity provision, of course, is quite distinct from the release, you would agree. Yes. All right, those are two distinct things. But doesn't the indemnity provision establish an identity of interest between the debtor on the one hand and the officers and directors on the other in terms of the fact that any judgment against the officers and directors in this case is going to be paid through the indemnity provision by the debtor? And so you have the danger of these later donor suits chewing up the assets of the bankruptcy estate just by virtue of the operation of the indemnity provision. Your Honor, a couple of points. First, the indemnity that was right on below is the indemnification contained in the bylaws of the National Heritage Foundation with respect to charitable organizations, charitable corporations. Nevertheless, the point was addressed by Judge Trenga, four square. And Judge Trenga said, let's look at the evidentiary record established at the confirmation hearing. With respect to the evidentiary record at the confirmation hearing, there is no evidence, zero evidence before the bankruptcy court with respect to the number of potential donor lawsuits. But didn't he rule against you on that particular Dow Corning factor that the indemnity provision established an identity of interest between the debtor and the third party officers and directors? He said that was one of the things he counted against you, didn't he? There are six elements of Dow Corning, the first of which both Judge Kenney I'm talking about that factor. Both Judge Kenney and Judge Trenga said that based on that, there was an identity of interest between National Heritage and the directors and officers. I thought Judge Trenga found otherwise. I thought he overruled Judge Kenney on that first issue. I don't believe so. I think what Judge Trenga was doing was saying that with respect to whether or not the provision was essential to a successful reorganization, the second of the Dow Corning factors, Judge Kenney said there's no evidence before the trial court, before the bankruptcy court, of how many donor lawsuits could be expected, what the expected size of the claims were, what the nature of the claims were, what the amount of defending any of such claims are, whether or not there's any insurance. Was there any kind of stay in place? I mean, normally you have an automatic stay at the time of the bankruptcy plan is filed under Section 962, and that would operate to stay credit to suits. Do we have something comparable to the automatic stay with respect to donor suits? Well, it depends on what you're talking about. Because what you're telling me is, oh, not to worry, Judge, these donor suits aren't going to blossom. But with 900 people out there, you know, I'm just a bit skeptical and wonder why wouldn't these donor suits blossom in the form of a class action, number one, it would seem the kind of thing that would be amenable perhaps to class action treatment, or maybe in the individual suits. And we already know that this California suit has blossomed with the Burmans as the plaintiff. Now, is there a stay in place to prevent these suits from going forward and not give the donors a relatively advantaged position vis-a-vis the estate's creditors? Well, let's make sure we're talking about the same thing. What we're talking about is a release provision which operates to extinguish liability with respect to non-debtor parties, the DNO, for conduct which occurred antecedent to the bankruptcy filing. That's all we're talking about. Those release provisions apply to nothing other than that. There is no stay which says that you can't sue non-debtors. Indeed, what is happening here is that there are lawsuits. If there's no stay involved, then why wouldn't the prospect of donor suits be rather likely? The question is whether or not there are donor lawsuits that would be brought against the DNO. And what Judge Kenney said was, look, if you're going to try and establish the propriety of third-party releases, you need to present evidence before the court at the confirmation hearing as to whether or not these sorts of provisions are justified. And Judge Kenney and Judge Trenga both found exactly the same thing. There was no evidence. What assurance can you give me if there's no stay in place? I mean, we would never accept a representation at a bankruptcy because, oh, there's not going to be any individual credit to suits. No, and the drafters of the bankruptcy code said, well, we think it's likely enough. You've got to have an automatic stay provision. So what concrete with 900 people out there, what kind of assurance do we have that there's not going to be a proliferation of donor suits that's going to, through the operation of the indemnity clause, chew up the assets of the bankruptcy estate and put the donors in a relatively privileged position vis-a-vis creditors? That's all I'm asking. I want to know. Very well. If I may address that. First of all, there's two very important answers. Number one, that shifts the burden the other way. What's happening here is the debtor is coming in and asking the bankruptcy court to enter extraordinary relief, to enter an injunction barring such lawsuits against third parties. The burden is on the debtor to establish that those third-party suits are likely, the amount of those suits, the – Mr. Merrick, there is an automatic stay in place, isn't there? Against the debtor. Okay, but apparently the California court, in finding your client in contempt, found that that stay or some other equitable provision extended to that lawsuit in California, and that was a violation of some order, whether a stay or otherwise. Am I right? What happens, Your Honor, just to be very clear about that, was that when the plan was confirmed, there was in place with respect until it was reversed by this court, there was in place a provision which said that you couldn't bring a lawsuit against these third parties because Judge Kenney had to act on whether or not the third-party releases were sustainable on the evidentiary record. The Behrmans filed suit trying to preserve the statute of limitations. They've since been sanctioned for jumping the gun on that, even though Judge Kenney ultimately ruled their way. They were sanctioned for jumping the gun. That's a true statement. But I do want to get back to Judge Wilkinson's point because it's an extraordinarily important one. It's an important one that you understand. The burden is on the debtor. That's what Judge Kenney and that's what Judge Trenga said. And the second point that's even more. Your argument here just produced a report that was simply a failure of proof. That's exactly what this court sent it back for. That's what this court said. What is the evidence? That's what Judge Diaz wrote. That's what you were on that panel and read that said that same thing. What is the evidence, and will it support the fact, the specific facts? One other point I really, really want to make before I get away from the podium, and that is I'm a little bit frightened by the proposition here. If one can merely put in an indemnification in a reorganization plan saying that the debtor is going to indemnify the directors and officers and then point out that there's a bunch of creditors out there, in any case, one has just made it real simple to get third-party releases sustained in every Chapter 11 case because you simply put in an indemnification. One of the things that concerned me with respect to the other side was that the terms of the release were extraordinarily broad and that if we upheld the release here, we'd be upholding the release as a general matter. What is the limiting principle in terms of your position? Because we haven't adopted a multi-factor test under Dale Cornyn, and we haven't associated ourselves with the Tenth Circuit's position that these things are automatically invalid. We just don't. And the concern that you have is if we sort of invalidate these releases as a matter of course, are we introducing a significant deterrent to service as officers and the people to serve as officers and directors of corporations all across the country? Are we just opening them up to personal liability in every case in which there's a bankruptcy? Because if there's a bankruptcy, shareholders or donors or anyone else are not all that happy with what's happened in the corporation. Something bad happened to drive a corporation into bankruptcy, and a lot of people are around to blame. So if these releases are, as a matter of course, invalid, does that open the door? What assurance can you give me that this doesn't open the door in bankruptcy proceedings to all kinds of non-creditor lawsuits who are not covered by the automatic stay and have reason to be displeased with officers and directors for false, real, and imagined? How is your position limited? I don't understand completely how the other position is limited. How is yours? Well, a couple of things. First of all, I agree that the Fourth Circuit has not adopted the Tenth Circuit position, so that's not the law here. Secondly, the position in terms of the limitations is exactly what this Court has said, both in Bearman 1 and in Robbins, and that is you've got to have an extraordinary set of facts, ones which would not operate with equal force with respect to any number of Chapter 11 reorganizing debtors. So if you're going to come in here and you're going to ask the Bankruptcy Court to extend the discharge and the release that would otherwise be afforded to Chapter 11 debtors to those who do not seek protection under Chapter 11 of the Bankruptcy Code, you've got to prove up extraordinary facts here, and you've got to come into court with the evidence. But tell me, is this going to make it open season on officers and directors in terms of their personal liability in bankruptcy case? Are we going to have a whole set of collateral suits brought by people other than creditors who have reason to be displeased with the conduct of a corporation, and is it just going to be open season? Absolutely not. Well, tell me why. That's all I'm asking you. I don't want to hear about proof and burden to proof. I want to hear why it's not going to be open season. Because this case is about whether or not the facts below satisfy the existing standard in the Fourth Circuit. If you affirm and say Judge Kenney and Judge Trenger were correct, the facts in this case do not meet the standard of the Fourth Circuit, it doesn't change the rule at all. The rule exists as it is. That rule has already been existing, and that rule was established in the How many distinguishing facts are there here from just the normal course of a bankruptcy? There are none. This is a case where directors and officers come in, they propose a plan of reorganization, they say we'd like to get an exculpation, too. We would like to be immunized from a lawsuit. In fact, if you take a look at the evidentiary record, the only witness to testify below said this case is indistinguishable. These directors and officers are in no different position than any other directors and officers in the Chapter 11 case. That was her testimony, the only witness to testify. This case is indistinguishable. In fact, the reverse is exactly what would happen. If you were to sustain the releases in this case on the testimony that says these directors and officers are no different than the directors and officers in any other Chapter 11 case, you open the floodgates and extend the discharge provision to non-debtor cases, to non-debtor parties in virtually every case. This court has said that's inappropriate. Judge Diaz wrote that in the first time around. This is a case where somebody's got to come in and say it's extraordinary here. This was examined by Judge Kenney. He looked at all of the evidentiary record. He looked at it in its entirety. Judge Trenga said, I think he's entitled to the deference of clearly erroneous with respect to the facts here, but National Heritage disagrees, so I'm going to de novo look at the entire factual record. Both of them applied this court's case law in the decision. What do you think of Mr. Goroff's point that Judge Trenga might have second thoughts about his decision in light of events that have occurred since entry of the judge below? That's a troubling point, but one I do want to address quickly. First of all, that's an unfortunate digression, and I hope the court's not going to be biting on that. There are three reasons why that shouldn't happen, and they're very fundamental. Number one, on March 6, 2012, Judge Kenney said to National Heritage Foundation, do you want to reopen the record? Do you want to take a look at, do you want to put on additional evidence? National Heritage said, no, you must decide this on the basis of the evidentiary record presented on October 15, 2009. There was good reason for it, because if they had reopened the record, what they would have learned is that four months earlier, the Internal Revenue Service revoked the IRC 501C3 status of National Heritage. Now you're going outside of the record. Right, either way, either way. Let's back up then. I guess Mr. Garff's principal point is you've got an unusually litigious donor, and as he put it, the sharks are in the water. And now there's a real possibility of litigation affecting the reorganization in this case. How are we to take that assertion? Well, first of all, that's not accurate, because first of all, he's relying on subsequent events. So we're either going to rely on the events and the proof at October 15, 2009 or not. If the court says yes, then those events aren't for game. If, on the other hand, the court says, no, let's take a look at those subsequent events, then look at all of the subsequent events. Look at the events of four months earlier, November 2011, when the Internal Revenue Service revoked the 501C3, and National Heritage Organization could not have reorganized on the basis that it did reorganize. You see, you can't have it both ways. What National Heritage wants to say is let's rely on some subsequent events, but not other subsequent events. But what they told Judge Kenney is we need to decide the third-party releases on the basis of the evidentiary record established on October 15, 2009. If you go beyond that... The evidentiary record indicates the Burmans have brought the suit. There are 900 donors out there. And what I'm worried about, and I think this was what G.H. Diaz's question went to, is that in Chapter 11, reorganization bankruptcies are going to be sabotaged by collateral civil suits, one of which has already been brought. And the debtor's going to suffer. The whole idea of Chapter 11 is to give the debtor a chance to get back on its feet. And you have 900 potential litigants out there, and through the indemnity provision the debtor's assets are going to be depleted by collateral tort and RICO suits. And the whole idea of letting a company get back on its feet and giving the creditors partial payment and preserving jobs and having the company go forward on a sound basis can be sabotaged by all of these suits lying in the weeds and out there in the woods. And you're not allaying my concerns about it. You have some good points to your argument. You really do. And I understand all the points about Judge Kenney and the multiple-factor Dow Corning test and the fact that we have the burden of proof and the fact that these tort suits have not, as of this very minute, other than the Berman suit, emerged. But there's also a problem here, and why are we not doing damage in this particular scenario to Chapter 11 reorganizations? I want you to allay my concerns. I think the way this works is that if you have a situation where a debtor proposes a plan and the plan says, I want to extend relief to third parties who are non-debtors, the burden is on the debtor to come forward at confirmation to establish that those releases are justified. That's what Berman 1 says. And what happens in this case is there's no evidence. But you look at the subsequent events and you say, I'm going to speculate that there's going to be more than the Berman suit. I'm going to speculate how much those will cost. I'm going to speculate on what the impact will be on reorganization. I'm going to speculate on whether or not there's any insurance to defray those costs. All of that, there is zero evidence. This Court would have to speculate on all of that. If that's what you do, then what will happen is it will become absolutely imperative in every Chapter 11 plan to put in something that protects non-debtor parties. That violates Section 548E of the Bankruptcy Code, which specifically says non-debtors are not entitled to the protection of a discharge absent extraordinary circumstances that this Court has outlined. Let's just assume for the purposes of argument, Chapter 11 is an ongoing process once the plan is confirmed. And a year from now, there are 300 donor suits actually out there. What barrier would there be to the debtor of national heritage to go back to the Bankruptcy Court and ask that the plan be amended? Well, the debtor can go back, ask that the plan be amended within the terms of the Bankruptcy Code. It may have to, or the debtor could file a second Chapter 11 provision, which is sometimes done as well as the Court has sometimes heard them call Chapter 22 kind of things. So it's not like the debtor is not without protection. But the issue is whether or not the release should be approved in the first instance absent any proof. That's what is so disconcerting here. All right. Well, you've answered my question in that regard. I have one last quasi-tangential question. As I understand the Bankruptcy Court's order, the release provision is now excised in toto from the confirmation plan. Is that right? The release provision is out completely. That's my understanding, correct. And I was just curious. I understand the controversy with directors and officers, but it seems surprising to me that the creditors' committee and members also were taken out. I realize they're not here as a party, but I thought that was a little unusual. Well, it goes to the issue of the breadth of the release that Judge Wilkinson was talking about. I mean, you can take a look at page 9 of Judge Kenney's opinion to see the breadth of that release. It's extraordinary. Right. I know that. I mean, this doesn't go to the point of the appeal today, but I've seen an awful lot of Chapter 11 plans over time that it's routine to include the creditors' committee. Well, not only is it non-routine, it's nonsensical. This is a release which releases pre-petition claims. There's no creditors' committee pre-petition. What about the antecedent claims for service on the creditors' committee? That's not governed by the release. That's governed by the exculpation provision. But for periods of time antecedent to the filing, there is no creditors' committee. This release is so broad and was adopted so quickly, they released a creditors' committee that didn't exist from claims where the creditors' committee could not exist. But your point's very well made. But is there any way, I want to follow up on Judge Agee's question, which I thought was an excellent one. As the bankruptcy proceeding goes along, is there any way to protect, maybe you don't reinsert the release provision, but what could you do to protect the assets of the bankruptcy estate against being bled by incessant civil litigation? What can be done as the Chapter 11 proceeding moves along? Well, if this really were a concern, they could file another chapter proceeding and they could protect it in that sequence. They could do any number of things, but that's the one that occurs to me most notably. But has the horse left the barn by that time? No, because if they're – The litigation's rolling. If litigation is rolling and you file a chapter proceeding, that's going to bring it to a halt, Section 362 of the Bankruptcy Code. So there are, of course, methodologies for doing that, but the real concern here is what is the debtor required to do in the first instance to extend this protection? The real concern is – your focus, Judge Wilkinson, is clearly on, gee, we've got to protect the debtor, we have to protect the debtor. Congress has said, and this is an important provision, Congress has said, we've enacted a bankruptcy code that does not extend this kind of protection to non-debtors. That's a legislative decision. That decision has a judicially crafted exception in extraordinary circumstances. But for this court to simply say, gee, if there's an indemnification provision in the reorganization plan, we're going to open the floodgates for Chapter 11 plans that essentially protect every director and officer by coming into court and asserting there's lots of potential claimants against this debtor, you will have simply rendered dead letter the legislative pronouncement in the Bankruptcy Code that these kinds of immunities for non-debtors do not exist. That could have been written into the legislation. It was not. Thank you, sir. Thank you. Your Honor, to ask Mr. Merrick what could be done to avoid the Before you get there, didn't Mr. Merrick make a good point here, and that is that we are essentially extending to non-debtors a discharge in bankruptcy and that when you're extending third parties, non-debtors, a discharge in bankruptcy, you're going beyond the purposes of the Bankruptcy Code and bankruptcy proceedings and we ought to have some sort of congressional authorization before we take that step? No, Your Honor. We have non-debtor releases approved in multiple cases and they're done so under Congress's laws, 105, 524E, 1123 of the Bankruptcy Code, and they're authorized here and they're particularly important here because of the broad indemnification, that's one, so that any time the directors in offices are sued, it's a cost dollar for dollar borne by NHF that cannot be used for its charitable purposes. And we know, Your Honor, that it's 9,000 donors who will sue, and the finding of Judge Kenney Well, I don't know that we know that. I think that's your opposing counsel's, wait a minute. I'm sorry. Opposing counsel's point is I understand it, that this turns in large part on a failure of proof on behalf of your client. That's his argument, that at the opportunity to introduce additional evidence to what was already in the record, there could have been expert witness A or testimonial witness B that says here's my evidence as to why it is not speculative that someone other than the Biermans would be inclined to bring this action, and if they do, here's my view as a witness, as an expert, as to how likely it is that that will detrimentally affect the reorganization of the debtor. But as I understand it, none of that's in the record. Well, Your Honor, the record, as read by Judge Kenney, led him to come to the following conclusions. Not knowing about the California suit, this is at Joint Appendix 1557. Should the release provisions be excised from the plan, there is a very real possibility that the officers and directors will be sued by the donors whose numbers run into the thousands. The officers and directors would then look to the debtor for indemnification, which would include, among other things, advancement of legal fees to pay their expenses in defending the donor claims. He also found the real possibility, indeed, of multiple donor lawsuits coupled with the officers and directors. Who is this now? Judge Kenney. I'm reading from the remand order. Page 17 of the remand order, Joint Appendix 1557. The right to indemnification and advancement of legal expenses could have a materially negative impact on the debtor's ability to successfully complete its reorganization. Speaking of identity of interest, Judge Kenney said, this factor weighs in favor of the approval of the release provisions. Now, Judge Diaz, you were correct. Judge Tranga disagreed that there was an identity because he said there was no proof. The reason there was no proof was because the Behrmans misled the court. And Judge Tranga felt misled. And if you read the transcript of the stay, District Court Docket Number 47, at page 48, he shows a change of heart. And he stated now, in granting a standing appeal, the court also concludes that for the same reasons articulated by Judge Kenney, there is a sufficient showing of NHF of irreparable harm in the absence of a stay. The court is now aware of an actual lawsuit against NHF's officers and directors and a tangible impact on NHF. I suppose what recourse do you have? Let's suppose some of these suits actually are brought. Some of them are actually filed. Now, Mr. Merrick has suggested that you're not without remedies in that situation. Well, Mr. Merrick's remedy was to file another Chapter 11. So the notion of a successful reorganization, what 1129A of the Bankruptcy Code requires, what the Supreme Court's Bank of America precedent requires, that hallmark would be subverted, which is exactly our point. And the fact is the indemnification of the courts in the Chapter 11 and ask the court to make changes to the claim. Well, Your Honor, the Chapter 11 was confirmed in 2009. And so there's been a confirmation order that is final other than these releases. And it would be difficult, as Judge Wilkinson had used the analogy, the horse is largely out of the barn. So you could go back and you could have a series of hearings that Mr. Merrick would fight as they have fought everything in this matter. But in the meantime, you would have suits against directors and officers that were going forward by the beermen who tried to bring a class action, Your Honor, as you alluded to, and by others across the country. And these donors are sophisticated. JA 1542 Judge Kenney found that the average donation is somewhere in the $11 and $12 million range for donors. So we're talking about sophisticated people led by counsel. And what are we talking about eliminating here? The releases go to pre-petition claims through the effective date about the operations of the debtor. And these are the equivalent claims that could have been brought against NHF itself. And many were. So you had a subset of fraudulent inducement and rescission claims that the court considered. And those had the opportunity for full payment, $0.00 of the dollar plus 4% interest under the plan. And the others had the opportunity. Everyone had notice.  210 donors did. 343 claims totally filed. And the people who actually pursued their claims, the pending donor claims, had the opportunity to vote by virtue of 1126F because their vote by operation of law was treated as a vote for the plan. If they didn't like that under Bankruptcy Rule 3018, they could have asked the court for a motion so that their claim could be treated as disallowed so they could vote to reject the plan. Neither the Biermans nor any other donor asked for that. So what are we talking about at the end? We're talking about people like Ms. Anderson that this court already looked at who sat on their rights, who filed no claim against NHF about misuse of funds or fraudulent inducement pre-petition conduct, and who this court has already said has no claim. All the other 9,000 donors who didn't file, whose claims were denied, disallowed, untimely filed, never filed, have no claim. Under Bucks Hospital, they are not creditors who are adversely affected by this plan. Therefore, those three doubt-corning factors, right to vote, opportunity to be paid in full, opportunity to settle, do not apply to them. Thank you very much, Your Honor, for your time this morning. We'd like to come down and brief counsel and then take a brief recess.
judges: J. Harvie Wilkinson III, G. Steven Agee, Albert Diaz